Good morning. May it please the court. My name is Shelby White and I'm here on behalf of the appellants today, the Knotts family as well as the Knotts estate. This case is about using law enforcement techniques on someone who needed medical care, frankly. Mr. Knotts could not meaningfully resist. He is handcuffed twice. He has a double set of handcuffs on and he has a single set of handcuffs on. He is laying prone across a hospital bed and he has four officers on top of him as well as several other hospital staff people in the room. There is no chance that he can escape. There's no chance that he can do anything meaningfully violent to any of these officers. And what he needs is medical assistance from hospital staff, not prone restraint and people laying on top of him in an attempt to remove a second set of handcuffs. Now, was he resisting at the time? So no. Well, I mean, the Supreme Court has told us recently in Barnes v. Felix that we've got to consider the sort of what the lead up to all of this. Yes, he is resisting initially. I would say I don't think we really have a dispute on the initial resistance. It is a continued use of prone restraint after he stops resisting. So especially if you look at the Seacrest video around the 19 minute mark, I think 1908 is kind of when you see the resistance start to fade and they are on top of him for another two to three minutes using force on him. And then also at some point during that, he's going to die from the use of prone restraint. But we wouldn't be able to consider that fact in the analysis of qualified immunity. I think that you would be able to because the officers were there and knew that the sedative was being administered. And then after the sedative was administered, they continue to keep him in a prone restraint. When is the sedative administered in the video? I'm sorry, I don't have the exact time on it. It would be after in Seacrest video would be after the 19 minute mark. And I think it's around another minute and a half that after the sedative is given that they still remain on top of him. So the first thing I want to talk about is that the court improperly and the appellees are basically looking at this from a summary judgment context and from an evidentiary standard context and not a 12b6 context. At the 12b6 stage, as the court is well aware, as we just saw from the case behind us, we are just looking at whether we plausibly pled a claim for relief, not whether there's contradictory evidence to this. Here's what the video does not contradict. That medical records show that he had bruising on his chest and bruising on his back from the officers pressing down on him, which I think contradicts this idea that the pressure was not that much. You can't see the pressure in the video and you also need to consider that it's not just one officer pressing down on him, there's multiple officers pressing down on him and is a combined force, not a single force. Second, the medically determined cause of death, which was cardiac arrest and asphyxia due to prone restraint. So the medical examiner of the autopsy confirmed that he died because of the use of prone restraint and not from something else. Third, that law enforcement knew about the risk of prone restraints for decades. Let me ask you a question. You're not saying that it was the handcuffs that killed him? No. I would say that that is a factor that goes into why the prone restraint is dangerous. When you have your hands behind your back and you have pressure on your chest and abdomen, that's a factor that adds to the difficulty. So that's sort of the opposite of the old hog tying thing that we used to have cases on. But anyway, anyway, I mean this man is in the hospital, the hospital employees are saying they can't handle him, they're scared of him. Now what, how does that factor into the reasonable perceptions of the officers? I would disagree that that is a reason to be able to use prone restraint. She says, the nurse says to Mr. Knotts, we won't take these restraints off because we're scared of you and I don't think you can take that as a true statement that officers can rely on because she is saying it to calm down a patient who is in the midst of a mental crisis and she's trying to explain to him why she needs to leave the restraints on. Did the medical examiner describe it as a semi-prone position? I think, I think that term is used both by the appellees and by us, by the court and by the medical examiner. I don't. Do you think that makes a difference? No. So the issue when we, they are calling it semi-prone because he's not fully flat in terms of like, you know, head and feet are at the same level, but the issue that we have is the pressure on the abdomen and that is still, so he is basically has his abdomen laid across this. His feet are at, at least at certain times lifted up off the floor and so that aggravates that when you talk about prone restraint and how you can't breathe because you can't lift your chest and you can't expand your diaphragm, those are all, the fact that he's semi-prone does not change that analysis and it doesn't alleviate or lessen the danger here. And especially when, I know you, Judge Jones, you mentioned hog tying. To me, that is the, when you've got your hands behind your back and your feet are lifted up, that's getting close to a hog tying position essentially.  The other, the other factor that is important that is outside the video that we pled in, that we pled is that the law enforcement officer's report, which is something they prepared after the fact, stated that they, that Knotts did not attempt to injure himself or others, that he was not a threat essentially. So we have, I mean, I know that we're not at the summary judgment stage, but there is a fact issues to whether or not the officers were being truthful about why they felt they needed to use force on him. So certainly if we get further down the road, a jury should be able to consider that as a factor in the decision to use force. Then we look at what the video shows that does actually support the complaint. We have statements by Knotts that he couldn't breathe. And you can also hear his labored breathing on the video. So these officers know that he is in distress and that he's having trouble breathing and they don't do anything to alleviate that. Second, we have struggle attributed to air hunger. So when you see him at certain points trying to lift up his chest and the officers are saying they're calling that resistance, I don't think that you can necessarily say from looking at the video that it must be resistance compared to air struggle. There were medical personnel at least in the room this entire time? Not the entire time, but they... At the end? Yes. They come in around the time that he starts to say he can't breathe. At least one of the nurses said, I heard him scream that and that's why I came in the room. And then certainly they come in to administer the sedative. By the time that he is dead on the bed, there are about 10 people in the room. And I think that's another factor that goes to this idea that he was a flight risk or that he was going to escape. Looking at the video, you can tell there's no chance that he would be able to go anywhere. So we don't... So we discount the previous hour or whatever it was when he was at the hospital and then he absconded into the parking lot. We just discount all that as part of the circumstances? Honestly, yes. In the sense that when we're looking at the use of force in this moment of time and whether it's justified, those sort of factors are not relevant anymore. So yes, he did abscond earlier. He runs away. He gets about a couple of blocks away and they find him in the parking lot. I don't think there's a debate that he resisted at that time and that he struggled and that he did not want to go back to the hospital. The issue is once we get him to the hospital, he's handcuffed. He's got a double set of handcuffs on and then they put a single set of handcuffs on. And then he has two sets of handcuffs on and the struggle starts when they try to... Why were they trying to switch from the double to the single? Yes. And I think... I don't want the court to get the impression that switch meant they took one set off and put another one on. They put both sets on and then tried to take the second one off. And in fact... Yes, but Judge Douglas asked, why were they doing that? I think just because they thought that he had too much freedom of movement. They say that he squats down to try and take his handcuffs off. You disagree with that? I don't think that that's a characterization you can make from the video. He does squat down and he has his hands behind him, but he doesn't get that far. And then an officer stops him. And I mean... I know you know this, Ms. White, but in these cases, we also have to be concerned about clearly established law. Yes. So what cases can you point to that would have placed the officers on notice that doing this was violating the Constitution? Certainly, Tempa is the main one. And I think they take a fact issue with that it is not... Our time period is not as long as in Tempa. Also we have Darden and then Fairchild to me is the other one that is extremely relevant. And Fairchild involves a more similar set of someone who resists at first and struggles and then by the time that they are continuing to use prone restraint on her, she is not struggling anymore. And it is also around a two minute time period, which is what we're looking at. Tempa hadn't come out when these actions occurred, had it? Yes. Tempa and Fairchild, all three of those cases were out. Predated? What happened here? Yes. Here was November 2022. I believe Tempa was 2021. I know. But the case, our decision is not 21. It's later. No. The Tempa decision comes out in 2021. Okay. I'm sorry. I can double check from my... No, that's all right. I'll take your word for it. And then I double checked Fairchild this morning. Fairchild decision came out in July of 2022. So then we have this incident in November of 2022. So certainly we have established case law that predates this. And we have the other thing we need to look at is all of these cases are in the summary judgment context. And so they do have evidence before the court and the court is weighing evidence in this determination of clearly established law. And we haven't gotten to that stage. So we need to, when we think about those cases and think about, oh, you know, there's evidence the officer weighed this much and that's how long they sat on them and things like that. We don't even have that much evidence to kind of make that analysis and draw those fine point distinctions in the case law because we're just at the 12B6 stage. So at the 12B6 stage, we're close enough in the case law and we're close enough in our facts that a reasonable jury could take our version of events and compare that, I suppose a court, could take our version of events and what the jury found and compare that to the clearly established law and find that the law was clearly established. The last thing I want to talk about is the excessive force analysis, specifically deadly force versus just general excessive force. Deadly force, and this, Ms. Judge Douglas, you wrote about this in Ambler, it is a factual contextual question. You look at whether the force used carries a substantial risk of causing death or serious Is Ambler before or after this? Ambler postdates us. So can we use that? I think you can use it in the context of what the law is, but not in the context of making a clearly established law analysis. But when we talk about what deadly force is, for example, yes, I think we can use Ambler to talk about the law. And then also Tempa cites that same proposition. So certainly this is, Ambler's not talking about it like it's something new. So carries a substantial risk of causing death or serious bodily harm is what the deadly force analysis is. When you look at prone restraint here, that meets that test because we have a well-established 40-year history of the risk of it and police departments advising people to not use it unless it's absolutely necessary and to stop using it the moment it isn't absolutely necessary. What's the deadly force here? So the deadly force is the use of prone restraint. Am I misunderstanding your question? Prone restraint in your view is handcuffed behind your back and placed flat? The prone restraint here is handcuffs behind your back, feet elevated, body weight on you in varying degrees, and pressure being placed on your abdomen and lungs so that you can't breathe. So all of that? Yes. Okay. Yes. So it's not just... I wasn't clear from your briefing what that was. I apologize. So it's not just your handcuffed... So that's all deadly force. Well, that's a novel thing. We don't have a case that says prone restraint is deadly force, do we? So what we have is a case law that says deadly force is fact-dependent and contextually dependent. You look at the facts in that case and you say, was the force being used... But that's just the opposite of what qualified immunity is about, though. I'm not sure that I understand that question. Well, I don't understand why you're saying we can make new law about deadly force over the claim of qualified immunity. Oh, and I'm not advocating for a new definition of deadly force. I think the definition is well-established, but what the courts have said about deadly force is that it is fact-dependent on whether the force is deadly. We don't just... Aside from guns and maybe knives, not everything is de facto deadly force or de facto not deadly force. We look at it contextually to see how the force was used in that context as to whether a reasonable officer would understand that he's running a risk of death or serious injury. How does it make a difference to the qualified immunity analysis to introduce this idea of deadly force? So the difference between deadly force versus excessive force is that deadly force puts you under Graham, which says you cannot use it unless there is an immediate... The threat to others or themselves must be immediate and they must be posing a serious risk of harm. And so here, if this is deadly force, which we do believe it is, at least there's a... You're saying the law is that when you get into the deadly force realm, it's a different analysis for qualified immunity? Yes. So excessive force would be under the Kingsley factors, which would be the relationship between the need for the use of force and the amount of force, the extent of the plaintiff's injury, efforts made by the officers to temper a limit. There's about six factors under Kingsley that are a little bit more nuanced versus Graham says do not use deadly force unless there's an immediate threat of death or serious harm to themselves or others. And so Kingsley would say you can use some degree of force, we'll decide when it's excessive based on a series of factors. Graham says don't use deadly force unless you absolutely must. But even if we are, excuse me, I'm out of time. So with that, I will wait for rebuttal. Well, thank you very much and you do have time for rebuttal. Mr. Mendelson. Thank you, Judge Jones, and may it please the court. The easiest way to dispose of this case is on qualified immunity's clearly established prong. Now, to overcome qualified immunity, it's the plaintiff's burden to cite a case that is factually analogous to this one that finds a Fourth Amendment violation. In our view, the plaintiffs both misunderstand that burden and they have not met it. They even are attempting to revive the moment of threat doctrine. My friend on the other side said we have to discount what happened in the parking lot. That's exactly how this court was reversed in Barnes v. Felix just last term. And we think that even once we take into account all of the totality of the circumstances, the officer's actions here were reasonable. But I want to begin with the clearly established prong and then discuss what the totality of the circumstances were. So Judge Jones, writing for the court in the Harmon case, explained that in the qualified immunity context, the results depend very much on the facts of each case. And we have to have a case that squarely governs the specific facts at issue. And that's a very high standard. The Henderson case explained because that case was a case about tasing and fleeing. If an analogous case isn't about tasing or fleeing, it doesn't count. Harmon described and Henderson both described the burden as so high that an officer would have to know that, quote, in the blink of an eye, in the minute of a high-speed chase, it would be clear to every reasonable officer. That's the standard that has to be applied here. So my friend on the other side just discussed three cases, Timpa, Darden, and Fairchild. But none of those cases match what are the material facts here, and I want to talk about all three of those. So importantly, Timpa does not hold that a prone restraint is categorically unconstitutional. It does not. It says like any other tool that police officers use, it can be or it may not be depending on the facts or the circumstances. So my friend's briefing on the other side talks a lot about secondary sources, the dangers of prone restraint. Incidentally, none of them are in the complaint, so they can't be considered in any event. But the point is, you could say that about any tool that police officers use, guns, tasers, any of them. There are times when they can be used. There are times when they cannot be used. It all depends on the totality of the circumstances. And I want to start off with how this case has been briefed as it relates to Timpa. The first is that my friend's briefing seems to repeatedly misuse the term body weight force and why that was very important to Timpa, as opposed to this case in our view is very important. When not, when, excuse me, when Timpa was talking about body weight force, it was talking about an individual officer who weighed 190 pounds and sank his knee into somebody who was on the ground and incidentally did so for 14 minutes, including five minutes after the individual stopped moving. There's two important material distinctions there. One is that in this case, the officers were standing with their feet on the ground and using their hands. They weren't sinking their body weight with a knee as the officer was in Timpa. And second of all, I want to talk about the timing because that just came up. This entire incident lasts three minutes and 20 seconds. I'm referencing the Sechrist body cam. For about the first minute and 40 seconds, there's definitely active resistance. There's a period of about 40 or 50 seconds where the officers seemingly back off. Officer Vejar removes one of her hands. You can see their grips are loosening a little bit. Then there's another struggle for about 10 seconds. That's when the sedative is administered. My friend on the other side is incorrect about the timing of that. Within 40 seconds of that sedative being administered, the officer stepped back and released it. Well, Judge Starr said 80 seconds after that. Yeah, I'm afraid that's a small mistake. I think Judge Starr was referring to—so there's a little problem there, and that is that Officer Ledbetter still has one forearm on a shoulder. At that point, of course, that's certainly not a prone restraint or any serious amount of pressure at all. So it's 80 seconds from when the sedative is administered to when Officer Ledbetter, who's the last one, removes that forearm. It's 40 seconds from when all of the other officers release him, and simply having one forearm on a shoulder, we don't think that could possibly be deadly force. No reasonable jury, we don't think, could say that. The other point I want to be sure to make is not just the timing, the hand positioning, but as I alluded to, all of the prior events that happened are different in Knotts than they were in Timpa. And of course, what I'm referencing is escaping the hospital, lying to the officers, physically resisting them in the warehouse parking lot, showing that he was stronger than a lot of the officers, the hospital staff saying, we don't feel safe with you. There's no facts like that that are present in Timpa, and that, we think, has to be another material distinction. Darden, Darden is a case about using tasers, about physically choking somebody, about slamming someone to the ground and punching and kicking someone, in combination with using a prone restraint. And so once you add in something like a taser, or physically choking somebody, those are material distinctions that don't work for purposes of clearly established law. Fairchild, which was the last case that my friend on the other side mentioned, that involves a case where two or three really important distinctions happen. The first is they involve a 390-pound person shoving a forearm onto somebody's neck. Nobody shoved any pressure onto Knotts' neck in this case. And that also happened in the Fairchild case simultaneously with another knee, and thereby sinking body weight pressure into somebody's back. And incidentally, that seemed to last for two minutes, according to the Fairchild case, after the individual was subdued, not 40 seconds after a sedative was administered, and we think that matters, too. So in our view, the court doesn't even have to fully adjudicate whether a Fourth Amendment violation occurred. And that's because, as District of Columbia v. Wesby held, courts should think hard and then think hard again before addressing the merits if it can be resolved on the qualified immunity prong. And we think that that alone can dispose of this case. But even if the court disagrees with that, we don't think that any Fourth Amendment violation occurred. And I want to talk about what all of the facts and circumstances were. So of course, we begin with the fact that the moment of threat doctrine was overruled in Barnes v. Felix. On page 16 of my friend on the other side's reply brief, she still cites moment of threat doctrine cases. But it bears repeating that that's all been overruled, and we have to look at the events prior. So I want to look at all of those things. In our view, there's seven facts that really show what the totality of the circumstances were and why the officers acted reasonably. The first is the statute that we referenced in our brief. I'm talking about 573.001 of the Health and Safety Code. Why was Knott's in the hospital in the first place? That statute says why. The Hutchins police officers took him to the hospital because they used that statute. And Officer Ledbetter even talks about the statute on the video. And that's the statute that says if someone has a mental illness and poses a substantial risk of serious harm, the officers can take him to a hospital for a psychiatric evaluation. The UT officers knew that a different police department believed he posed a substantial risk of serious harm. Then of course, we get to all of the actions. Then we get to Knott's telling the officers he won't run away. But of course he does. Then they chase him. In our view, this meets the first Graham factor. 3804 of the Penal Code, of course, says that running from the police is a crime. Here's another reason to grant qualified immunity. We don't think there's a Fifth Circuit case that says that's a, quote, serious crime within the meeting of the first Graham factor. We think this court should say it is. In our view, running from the police absolutely is a serious crime. But that's a point that's not clearly established. That's another reason to grant qualified immunity. And we think the court should say that is a serious crime in this case. My friend on the other side's reply brief seems to suggest that mental health concerns cut in their favor. And I want to talk about why that's in. I want to go back. I want you to tell me what your rationales or reasoning for running from the police being a serious crime. Well, this court in Salazar explained that interfering with the duties of a public servant is a serious crime. It also explained that in DWI, that's admittedly a little bit different. And I'll see how those two things compare to running away from an officer. Well, interfering with the duties of a public servant, we think, would be sort of like running from the police. But again, if the court disagrees, the court can say that's not clearly established. Well, if you run from the police, they typically chase you. Correct. And that sort of seems to, I would think, I've never run from the police when I've been arrested. But when you've been arrested? No, I haven't been arrested. That you know of. But when you do that, it would seem to me to escalate the risk of the situation. Yes, no, we think that's exactly correct. And then, of course, this was a situation where the police even felt that they needed to use a taser. Now, the taser missed. In this case, there was a taser, but it missed? The taser missed. Only one probe connected, so the circuit did not complete. And therefore, there was no tasing. But putting that to the side, I think there's some other facts, though, that are really important. And then, of course, we get, so he disobeys the police officer's commands to stop running. Then, when we get to the parking lot, he stops them from putting him in a police car, so they know he's very strong. He actually uses his feet to push against the police car, so they can't get him into the police car. Where is that information in the record, the resisting the police in the parking garage, pushing feet? Well, we see it. I think we hear it described. I'm referencing Officer Ledbetter's body cam. I think you just can see a little bit of the struggle, if you look at that. I'm just talking about what's on the video. It's a different video. Yeah. Is that when they were trying to put his legs in a car? Is that what you're referring to? Yeah, they're trying to put his legs in the car, but they can't. That's what I'm referring to. Then, we hear the officers, of course, say, or the officers hear the hospital staff say, well, we don't feel safe with you. That's why you need to be in these handcuffs. I think that when clinical staff at a major tier one research university say they don't feel safe with somebody, the officers are entitled to rely on that and think, OK, these are professionals that deal with psychiatric patients. If they don't feel safe, we should at least be able to reasonably infer that this person might be dangerous. And then the last two points, which, of course, are the attempting to slip the handcuffs and then the struggle on the bed. And I want to break those down a little bit in detail. So Pine View, North Carolina, of course, explains that reasonable mistakes of fact do not violate the Fourth Amendment. So the video shows Knott's bending down, appearing to slip his handcuffs. We hear the officers say on the video, you're not going to do that. My friend on the other side seems to suggest that because this is a 12B standard, we have to draw the inference in favor of her. That's not correct. What matters is what would a reasonable officer perceive. And conversely, for qualified immunity purposes, could we say no reasonable officer could think that this was someone trying to slip their handcuffs after everything that had happened prior? So we think that reasonably, even if mistakenly, although in our view certainly correctly, this was someone trying to slip their handcuffs, even if they made a reasonable mistake of fact, though we don't think they did. And then the actual struggle on the bed. I want to talk a little bit about why, in our view, that case is even stronger for us than when the district court decided this. And that's because of the opinion for the court, Judge Anderson v. Estrada, that hadn't come out at the time the district court ruled on this. And what that opinion says is that any physical action beyond just pulling your hand away from the police, if you escalate beyond that, then that is active resistance within the meaning of the Graham factors. That opinion also says that if somebody is capable of and evinces erratic behavior, as Knott's did, that's enough for the second Graham factor. And so we think that that opinion makes it an even easier case than it was before the district court. Incidentally, that opinion also says that disobeying the police when they tell you to stop is active resistance. And on the video, we can hear Officer Behar keep saying, stop, stop, stop, let go of my hand. We hear Officer Ledbetter raise his voice and say, let go of her hand. We hear him saying, stop kicking, stop kicking. But she told him so many times to stop. And of course, there was a pretty lengthy struggle there before he eventually did. And so we think that all of those factors combined show us that the officers here acted reasonably, and at the very least, that there's not a case like this one for clearly established purposes. Can I ask you about the deadly force analysis, which is being talked about in this case, and I guess in some of our other cases, as sort of a separate category of force? How are we supposed to discern whether force is deadly or not? I mean, lest anyone think that that's a ridiculous question since this is a death case, I struggle to think that our cases stand for the proposition that because force was used and death occurred, therefore the force was deadly, and we have a different analytical structure. What's our law on this? That's correct. And we cited a case called Brothers v. Zoss in our brief that says that just because force unfortunately results in death does not mean that it is deadly force within the meaning of this court's case law. That's exactly right. It's referencing Justice Scalia's concurrence in a separate case, and this court adopted that. So what is the standard? If, in fact, there's a different analysis that comes into play when deadly force is used, how do we know? So the court says that deadly force is something where there's a substantial risk of serious harm, substantial risk of death or serious bodily injury. The point I think that the court should make in this case is once you take away all of the other factors in this court's case law, like tasers or choking or slamming to the ground, punching and kicking, once you take away all of those types of factors in cases like Tempa or Fairchild, we think this would be the First Fifth Circuit case that would say that this type of restraint on this set of facts could be considered by a jury to be deadly force. That's another reason, in our view, to grant qualified immunity is these facts just don't seem to be like using a taser. What about the Ambler case? Well, the Ambler case was decided in 2024. That, of course, was after the events of this case in 2022, so it's not relevant for QI purposes. But even regardless of the clearly established point, that's an eggshell skull case. So that's a case where the individual told the officer that he had congestive heart failure. And that, of course, is, in our view, a material distinction that's just not part of this case. When you have a serious medical condition like that, I think that has to change the game. But again, it was decided in 2024. So if the court has no further questions, we will ask that the judgment be affirmed. All right. Thank you, sir. Ms. White. Thank you, Your Honors. I want to start with Barnes and this idea that we are advocating for something other than a totality of the circumstances. I want to be clear that is not what I'm saying. What I am saying is that when you consider the totality of the circumstances, we are considering all of it. And that means that the fact that he ran and fled earlier, yes, that is a factor in the totality of the circumstances. But we also need to look at the fact that the situation he is in presently when they use deadly force, which is he has two sets of handcuffs, four to 10 people in the room with him, and he at some point has administered a sedative. So this idea that at the time that they use deadly force that he is a flight risk or that any of these other factors of what happened earlier, that he's going to spit on them, that he's going to run away, that he is too large and they can't control him, none of those are. So your proof on the other side said that they moved back 40 seconds after the sedative was administered. Do you dispute that? I'm not sure on the exact timing of it. I think it is probably. So what else should they have done? So he has stopped struggling before the sedative is administered. The sedative is administered and he kind of jumps a little bit. But he isn't really struggling before the sedative is administered for periods of time. And then the other thing that I think is distinguishing is they said that Officer Ledbetter just has his hand on his shoulder for the last additional 40 seconds and that that is not a use of force. I would disagree with that because the problem is he is still laying prone across the bed and force on his shoulder and upper shoulder and neck means that he cannot lift his chest to breathe. That's the entire issue with the use of force and prone restraint and why it causes death is that you are limiting someone's ability to use their lungs and use their diaphragm. And so putting weight on the upper back and on the neck is still force that prohibits him from breathing properly. And they know that he can't breathe properly and they also know at that point when Ledbetter still has his arm on him that he's been sedated. When suspects, so I mean, suspects are going to continue to flee. Suspects are going to continue to struggle. That's just a fact of life, unfortunately. If police, what are they, I guess I'll repeat what Judge Douglas said, what are they supposed to do instead of this? So I think that is an interesting point because one of the things that the officer says when they put two handcuffs on him, so this is at 1807, the officer says he's got a single pair on now too. Do you want me to take the doubles off or leave them on there? I don't know what works best. That means that before they started to get into the struggle with him to begin with, they had a debate about whether they even needed to remove the second set of handcuffs. Sure, but if I understand your point, but if the suspect continues to struggle, they have to restrain him in some way. So yes, he's handcuffed. Yeah, OK. I guess what I'm getting at is are there alternative strategies to, because we're just going to have case after case of, well, the suspect was struggling. So what are the? So I think the issue is, one, the necessity of using force here to begin with, which was the other option was to just leave him with two sets of handcuffs on, and who cares? He can wear two sets of handcuffs. It's not a big deal. The second is, if you're going to use force, what type of force is appropriate, and when do you need to stop using force? Compared to are people struggling or not, I do think force, I mean, this court has consistently held, and I wouldn't disagree with it, force can be appropriate in instances of resistance. The issue is when someone is in these high risk factors, he's having a mental health episode, he is, I mean, I think they disputed, but I would agree that he's overweight and he is large, and that is a factor that makes prone restraint more risky. Is that in the record, sort of his weight and height? His weight and height is not, but on the video you can see him. I mean, his physical body, he's not wearing a shirt. And you can see him compared to, I believe Ledbetter is kind of a similar size to him and some of the other, the female officer, I'm forgetting her name now. She's obviously much smaller, but everyone else is a similar size to him. But this idea that you can use prone restraint and continue to use it when the risk factors have been articulated in the sense that he says I can't breathe, so you know that he's having issues, then you sedate him, which you know is going to exacerbate those issues, and you leave him in that position. Everything that the literature says about prone restraints is you need to move him as soon as possible, as soon as reasonable. And so when he stops struggling. Judge Starr said they did reposition him. I would disagree with that. Well, I mean, it's either on the video or it's not, I suppose. Yeah, and I think that is a mischaracterization of the video, and I think that is an adoption of the Appelese version of events, that I don't think that the way that we have pled it and then what you see on the video, that that is a accurate representation of that. And I also think that even if they do reposition him, it is not in a way, if I could finish my sentence, it's not in a way that alleviates the issue with the prone restraint. So with that, we would ask the court to reverse and remand. All right. Thank you. Thank you.